Citation Nr: 1504673 
Decision Date: 01/30/15 Archive Date: 02/09/15

DOCKET NO. 10-26 316 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in San Juan, the Commonwealth of Puerto Rico


THE ISSUES

1. Whether new and material evidence has been received in order to reopen a claim of entitlement to service connection for a back disorder.
 
2. Entitlement to service connection for a back disorder.
 
3. Entitlement to service connection for a right knee disorder.

4. Entitlement to service connection for bilateral hearing loss.
 
5. Entitlement to a disability rating in excess of 30 percent for depressive disorder.
 
6. Entitlement to a total disability rating based on individual unemployability due to service connected disabilities (TDIU). 


REPRESENTATION

Veteran represented by: Puerto Rico Public Advocate for Veterans Affairs
ATTORNEY FOR THE BOARD

Shana Z. Siesser, Counsel


INTRODUCTION

The Veteran had active service from January 12, 1982, to December 8, 1982. This matter comes before the Board of Veterans' Appeals (Board) on appeal from a March 2009 rating decision issued by the Department of Veterans Affairs (VA) Regional Office (RO) in San Juan, the Commonwealth of Puerto Rico and a November 2012 and April 2014 Board decision. 

This appeal was processed using the Virtual VA and Veterans Benefits Management System (VBMS) paperless claims processing systems. Accordingly, any future consideration of this case should take into consideration the existence of these electronic records.

The issues of entitlement to service connection for a back disorder and entitlement to TDIU are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. In a June 2006 Board decision, the RO denied service connection for a back disorder. 

2. Evidence added to the record since the June 2006 Board decision is not cumulative or redundant of the evidence of record at the time of the decision and raises a reasonable possibility of substantiating the Veteran's claim of entitlement to service connection for a back disorder.

3. The Veteran does not have hearing loss for VA compensation purposes in either ear.

4. A right knee disorder is not related to service. 

5. The Veteran's depression has not caused occupational and social impairment with reduced reliability and productivity.


CONCLUSIONS OF LAW

1. The June 2006 Board decision that denied service connection for a back disorder is final. 38 U.S.C.A. § 7104 (West 2002); 38 C.F.R. § 20.1100 (2014).

2. New and material evidence has been received to reopen the claim of entitlement to service connection for a back disorder. 38 U.S.C.A. § 5108 (West 2002); 38 C.F.R. § 3.156(a) (2014).

3. Bilateral hearing loss was not incurred in or aggravated by active military service. 38 U.S.C.A. §§ 1110, 1131, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.303, 3.304, 3.385 (2014).

4. A right knee disorder was not incurred in active service, and arthritis may not be presumed to have been so incurred. 38 U.S.C.A. §§ 1110, 1112, 1113, 1137 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.307, 3.309 (2014).

5. The criteria for an evaluation in excess of 30 percent for depression have not been met at any point during the appellate period. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1-4.14, 4.125-4.130, Diagnostic Code 9434 (2014).



REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duty to Notify and Assist

As provided for by the Veterans Claims Assistance Act of 2000 (VCAA), VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2002); 38 C.F.R. §§ 3.102, 3.156(a), 3.159 and 3.326(a) (2014).

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his representative, if any, of any information, and any medical or lay evidence, that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). Proper notice from VA must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; (3) that the claimant is expected to provide; and (4) VA must ask the claimant to provide any evidence in her or his possession that pertains to the claim in accordance with 38 C.F.R. § 3.159(b)(1). This notice must be provided prior to an initial unfavorable decision on a claim by the agency of original jurisdiction (AOJ), as was done in this case. Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004).

In compliance with the duty to notify the Veteran of what information would substantiate his claim, the Veteran was advised that VA used a Schedule for Rating Disabilities (Schedule) that determined the rating assigned and that evidence considered in determining the disability rating included the nature and symptoms of the condition, the severity and duration of the symptoms, and the impact of the condition and symptoms on employment. 

With regard to claim for an increased disability rating for service-connected depression, the law requires VA to notify the claimant that, to substantiate a claim, the claimant must provide, or ask VA to obtain, medical or lay evidence demonstrating a worsening or increase in severity of the disability. 38 U.S.C.A. 
§ 5103(a); 38 C.F.R. § 3.159(b); Vazquez-Flores v. Peake, 22 Vet. App. 37 (2008), vacated and remanded sub nom. Vazquez-Flores v. Shinseki, 580 F.3d 1270 (Fed. Cir. 2009). 

The claimant must be notified that, should an increase in disability be found, a disability rating will be determined by applying relevant diagnostic codes, which typically provide for a range in severity of a particular disability from noncompensable to as much as 100 percent (depending on the disability involved), based on the nature of the symptoms of the condition for which disability compensation is being sought, their severity and duration. Finally, the notice must provide examples of the types of medical and lay evidence that the Veteran may submit (or ask the VA to obtain) that are relevant to establishing her or his entitlement to increased compensation. The notice must be provided prior to an initial unfavorable decision by the agency of original jurisdiction (AOJ). Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004).

Here, the VCAA duty to notify was satisfied by way of letters sent to the Veteran dated in December 2008 and December 2012 that fully addressed all notice elements.

VA has a duty to assist the Veteran in the development of the claim. This duty includes assisting the Veteran in the procurement of service medical records and pertinent treatment records and providing an examination when necessary. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159.

The Board finds that all necessary development has been accomplished, and therefore appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993). The RO has obtained the service treatment records, VA outpatient treatment records and private medical records. 

Additionally, the Veteran was afforded VA examinations in January 2009 and January 2013 that are determined to adequate for adjudication purposes, as they are based on a review of the record, an examination of the Veteran and a consideration of the regulations and rating criteria. Regarding the right knee, the 2013 VA Examiner reviewed the claims file and provided an explanation for the etiological opinion. Regarding the 2013 examination for hearing loss, the examiner performed audiological testing and provided a rational for the provided opinion. Regarding the depressive disorder, the 2009 and 2013 examiners fully addressed the Veteran's symptoms after eliciting a history from the Veteran.

Neither the Veteran nor his representative has identified, and the record does not otherwise indicate, any additional existing evidence that is necessary for a fair adjudication of the claim that has not been obtained. 
 
Additionally, there has been substantial compliance with the 2012 and 2014 Board remands and the Board may proceed to adjudication of this appeal. See Stegall v. West, 11 Vet. App. 268, 271 (1998) (holding that a Court or Board remand confers upon the appellant the right to compliance with that order). The remands requested that the RO send the Veteran a letter requesting information regarding medical treatment providers, send the Veteran a claim form for TDIU, obtain certain VA records, obtain SSA records, and provided examinations regarding hearing loss, right knee, and depressive disorder. A compliant letter was sent in December 2012; SSA records were obtained in December r2012; and VA examinations were provided in January 2013. VA records were eventually obtained in May 2014. 

No further notice or assistance to the Veteran is required to fulfill VA's duty to assist the Veteran in the development of the claim. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001); see also Quartuccio v. Principi, 16 Vet. App. 183 (2002).
 
Claim to reopen

The Board denied the Veteran's claim of service connection for a back disability in a June 2006 Board decision, finding that there was no indication his currently diagnosed back disorder was due to service. In June 2006, the Veteran was advised of the decision and his appellate rights; however, he did not appeal such decision to the Court or request reconsideration. Therefore, the June 2006 Board decision is final. 38 U.S.C.A. § 7104 (West 2002); 38 C.F.R. § 20.1100 (2014).

The evidence received since the June 2006 Board decision includes a private record that clarifies that an in-service notation of L. syndrome was lumbar syndrome. This interpretation clarifies prior evidence of record and indicates that perhaps a syndrome or condition was present during service. This evidence is both new and material to the claim. See 38 C.F.R. § 3.156 (2014). This new evidence addresses the reason for the previous denial; that is, a nexus to service. The credibility of this evidence is presumed for purposes of reopening the claim. See Justus v. Principi, 3 Vet. App. 510, 513 (1992). Accordingly, the claim is reopened and must be remanded, as further addressed below.

Service connection claims

Service connection may be granted for disability due to a disease or injury that was incurred in or aggravated by active service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. §§ 3.303, 3.304. Moreover, service connection may be granted for any disease diagnosed after separation, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

In order to establish direct service connection for a disorder, there must be (1) competent evidence of the current existence of the disability for which service connection is being claimed; (2) competent evidence of a disease contracted, an injury suffered, or an event witnessed or experienced in active service; and (3) competent evidence of a nexus or connection between the disease, injury, or event in service and the current disability. Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009).

In addition, certain chronic diseases, such as arthritis and sensorineural hearing loss, may be presumed to have been incurred during service if the disease becomes manifest to a compensable degree within one year of separation from qualifying military service. 38 U.S.C.A. §§ 1101, 1112, 1113, 1137 (West 2002); 38 C.F.R. §§ 3.307, 3.309 (2014). 

Congress has specifically limited entitlement to service-connected benefits to cases where there is a current disability. "In the absence of proof of a present disability, there can be no valid claim." Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992); see also McClain v. Nicholson, 21 Vet. App. 319, 321 (2007) (current disability element of a service connection claim is satisfied when a claimant has a disability at the time a claim is filed or during the pendency of the claim). 

Bilateral Hearing Loss

The Veteran contends that service connection is warranted for bilateral hearing loss. He believes that he has hearing loss related to period of active service. 

Impaired hearing will be considered a disability for VA purposes when the auditory threshold in any of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz is 40 decibels or greater; or when the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz are 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385.

The Veteran's Form DD-214 indicated that his military occupational specialty (MOS) was a food service specialist. Except for his November 5, 1982 separation physical examination, service treatment records were negative for complaints of or treatment for bilateral hearing loss. On the separation examination report, the audiometer results indicated abnormal hearing. However, during a November 15, 1982 follow-up hearing evaluation, he was retested for bilateral hearing loss, and the audiometer results were normal; the audiologist opined that the Veteran's hearing was within normal limits. The Veteran was separated from service in December 1982. 

The Veteran underwent a VA audiological examination in January 2013. His puretone threshold values were as follows:


500 Hz
1000 Hz
2000 Hz
3000 Hz
4000 Hz
Right
15
15
15
20
20
Left
15
15
10
20
20

Speech discrimination scores were 100 percent in both ears. Audiological findings were normal and the examiner found the Veteran had normal hearing in both ears. 

In consideration of this evidence, the Board finds that the Veteran does not have hearing loss for VA purposes in either ear during the period on appeal. Although a single examination during service showed decreased hearing at all frequencies and the Veteran alleges subjective hearing difficulty, hearing impairment for VA compensation purposes is defined under 38 C.F.R. § 3.385. It is based on a mechanical operation of measuring puretone thresholds and speech recognition scores. The levels necessary to meet the criteria for such hearing loss have not been shown during the pendency of the claim. Section 3.385 has been upheld as a valid regulation for defining hearing loss and limiting hearing disability below 6000 Hertz. See Palczewski v. Nicholson, 21 Vet. App. 174, 179-80 (2007). Here, the preponderance of the evidence shows that the Veteran does not have hearing loss.

In the absence of proof of a present disability, there can be no valid claim, and hearing loss has not been shown in this case. See McClain, 21 Vet. App. at 321; Brammer, 3 Vet. App. at 225. Consequently, service connection is not warranted for bilateral hearing loss.

Right knee disorder

The Veteran contends that he injured his right knee during service and has a current knee disorder due to that injury. 

Service treatment records show that in February 1982, the Veteran was treated for complaints of right knee problems for four days, while "doing a lot of strenuous exercising." The records show a diagnosis of stress of the right knee. He was treated with a cold pack. In the Veteran's November 1982 discharge report of medical history, he denied "trick or locked knee," "swollen or painful joints," and "bone, joint, or other deformity." He also denied any additional illnesses or injuries. The contemporaneous report of medical examination shows a normal clinical evaluation of his lower extremities. 

Post-service treatment records show a January 2009 magnetic resonance imaging (MRI) study of the right knee, which was found to have a linear horizontal tear in the mid-body of the lateral meniscus, minimal degenerative changes, a small Grade IV chondral change involving the articular cartilage over the medial femoral condyle with mild underlying subchondral edema, and marrow edema involving the posterior nonweight-bearing lateral femoral condyle. Right knee strain and meniscal injury were diagnosed in 2009. He reported to his physician that he had experienced knee pain since 1982. 

The Veteran was afforded a VA examination of his right knee in January 2013. The examiner noted a current diagnosis of a right knee disorder; however, the examiner opined that the Veteran's present knee disorder is less likely than not related to service. As a rationale, the examiner stated that claims folder shows the Veteran suffered a strain in his right knee in 1982 which was treated with physical therapy modalities with success with no sequelae or chronic damage event was acute and transient. 

In considering the evidence of record under the laws and regulations as set forth above, the Board concludes that the Veteran is not entitled to service connection for a right knee disorder. There is a current diagnosis of a right knee disorder and an in-service complaint of right knee pain. Thus, the remaining question is whether the current disorder manifested in service or within one year thereafter or is otherwise related to his military service.

Although the Veteran's service treatment records document a complaint of right knee pain in 1982, he did not seek any further treatment between that time and his separation. In fact, his separation examination found his lower extremities to be normal, and the Veteran denied any knee problems at that time.

In addition, the Board notes that the Veteran did not seek treatment immediately following his separation from service or for many decades thereafter. There is no medical evidence of the disorder or arthritis within one year of his separation. Therefore, the Board finds that a right knee disorder, to include arthritis, did not manifest in service or within one year thereafter.

Post-service, the Veteran was first treated for knee pain in 2009, 27 years after his discharge from service. With regard to the decades-long evidentiary gap in this case between active service and the earliest manifestations of the presently diagnosed right knee disorder, a prolonged period without medical complaint can be considered, along with other factors concerning a claimant's health and medical treatment during and after military service, as evidence of whether an injury or a disease was incurred in service which resulted in any chronic or persistent disability. See Maxson v. West, 12 Vet. App. 453 (1999), aff'd, 230 F.3d 1330 (Fed. Cir. 2000). The Board must consider all the evidence, including the availability of medical records, the nature and course of the disease or disability, the amount of time that elapsed since military service, and any other relevant facts in considering a claim for service connection. 

The Board acknowledges the Veteran's statements that he has had knee pain since service, despite the fact that he did not seek treatment until 2009. The Veteran is competent to report his experience and symptoms in service and thereafter. Layno v. Brown, 6 Vet. App. 465, 469 (1994); Buchanan v. Nicolson, 451 F.3d 1331 (Fed. Cir. 2006). A Veteran can attest to factual matters of which he or had had first-hand knowledge, e.g., experiencing pain in service, reporting to sick call, being placed on limited duty, and undergoing physical therapy. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). 

Lay evidence is one type of evidence that must be considered, if submitted, when a Veteran seeks disability benefits, and competent lay evidence can be sufficient in and of itself for proving the existence of a chronic disease. See Buchanan, 451 F.3d at 1335; 38 C.F.R. §§ 3.303(a), 3.307(b). The Board, however, retains the discretion to make credibility determinations and otherwise weigh the evidence submitted, including lay evidence. Buchanan, 451 F.3d at 1336. Once evidence is determined to be competent, the Board must determine whether such evidence is also credible. See Layno, supra (distinguishing between competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted")); see also Barr v. Nicholson, 21 Vet. App. 303 (2007). 

In this case, although the Veteran is competent to report his symptoms since service, the Board finds that such statements are not credible. His allegations are inconsistent with the contemporaneous record. As discussed above, the Veteran's separation examination showed that his lower extremities were normal upon clinical evaluation, and the Veteran himself denied any right knee problems at that time. Thus, the medical evidence indicated that he did not have a right knee disorder or right knee symptoms or complaints at the time of his separation from service. 

The record also shows that in January 2002, the Veteran was seen by a neurosurgeon for pain in his low back, hip, and leg that he stated were a result of an injury in September 2001. No mention of knee pain was made at this time. Buczynski v. Shinseki, 24 Vet. App. 221, 224 (2011) (noting that noting that the absence of an entry in a record may be evidence against the existence of a fact if it would ordinarily be recorded). 

In addition to the lack of competent and credible evidence showing that right knee disorder manifested during service or within close proximity thereto, the more probative evidence of record does not link any current diagnosis to the Veteran's military service. As noted above, the January 2013 VA examiner has rendered an opinion that the Veteran's current right knee disorder is not related to his military service. The Board finds that the specific, reasoned opinion provided by the VA examiner is of greater probative weight than the Veteran's lay assertions. The examiner reviewed the evidence of record and provided a thorough rationale supported by the evidence and his own medical training, knowledge, and expertise.

Based on the foregoing, the Board finds that a preponderance of the evidence is against the Veteran's claim for service connection for a right knee disorder. Because the preponderance of the evidence is against the Veteran's claim, the benefit of the doubt provision does not apply. Accordingly, the Board concludes that service connection for a right knee disorder is not warranted.

Increased rating claim

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities, found in 38 C.F.R., Part 4. The rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. 38 C.F.R. § 4.7. 

In considering the severity of a disability, it is essential to trace the medical history of the Veteran. 38 C.F.R. §§ 4.1, 4.2, 4.41. Consideration of the whole-recorded history is necessary so that a rating may accurately reflect the elements of disability present. 38 C.F.R. § 4.2; Peyton v. Derwinski, 1 Vet. App. 282 (1991). While the regulations require review of the recorded history of a disability by the adjudicator to ensure a more accurate evaluation, the regulations do not give past medical reports precedence over the current medical findings. 

Where entitlement to compensation has already been established and an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). However, where VA's adjudication of an increased rating claim is lengthy, a claimant may experience multiple distinct degrees of disability that would result in different levels of compensation from the time the increased rating claim was filed until a final decision on that claim is made. Thus, VA's determination of the "present level" of a disability may result in a conclusion that the disability has undergone varying and distinct levels of severity throughout the entire time period the increased rating claim has been pending. Hart v. Mansfield, 21 Vet. App. 505, 509-10 (2007); Fenderson, 12 Vet. App. at 126-27.

Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits. VA shall consider all information and lay and medical evidence of record in a case and when there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, VA shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). To deny a claim on its merits, the weight of the evidence must be against the claim. Alemany v. Brown, 9 Vet. App. 518, 519 (1996).

The Veteran's depression is currently assigned a 30 percent disability evaluation pursuant to 38 C.F.R. § 4.130, Diagnostic Code 9434. This rating contemplates occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood; anxiety; suspiciousness; panic attacks (weekly or less often); chronic sleep impairment; mild memory loss (such as forgetting names, directions, recent events).

A 50 percent rating is warranted when the psychiatric disorder results in occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships.

A 70 percent rating is warranted when the psychiatric disorder results in occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships.

A 100 percent rating is warranted when the psychiatric disorder results in total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name.

The use of the term "such as" in the general rating formula for mental disorders in 38 C.F.R. § 4.130 demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of symptoms, or their effects, that would justify a particular rating. See Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). It is not required to find the presence of all, most, or even some, of the enumerated symptoms recited for particular ratings. Id. The use of the phrase "such symptoms as," followed by a list of examples, provides guidance as to the severity of symptoms contemplated for each rating, in addition to permitting consideration of other symptoms, particular to each veteran and disorder, and the effect of those symptoms on the claimant's social and work situation. Id. A "Veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration." It was further noted that Section 4.130 requires the presence of certain symptoms but also that those symptoms have caused occupational and social impairment in most of the referenced areas. Vazquez-Claudio v. Shinseki, 713 F.3d 112 (Fed. Cir. 2013).

Psychiatric examinations frequently include assignment of a Global Assessment of Functioning (GAF) score. According to the Fourth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health illness." There is no question that the GAF score and interpretations of the score are important considerations in rating a psychiatric disability. See e.g., Richard v. Brown, 9 Vet. App. 266, 267 (1996); Carpenter v. Brown, 8 Vet. App. 240 (1995). However, the GAF score assigned in a case, like an examiner's assessment of the severity of a condition, is not dispositive of the evaluation issue; rather, the GAF score must be considered in light of the actual symptoms of the Veteran's disorder, which provide the primary basis for the rating assigned. See 38 C.F.R. § 4.126(a).

Psychiatric treatment records from 2008 and 2009 show the Veteran had a history of depression but was currently stable. He was assigned a GAF score of 60, which reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co- workers. The therapists observed he was calm, alert, coherent, spontaneous, oriented, friendly, relaxed, supportive, and cooperative. 

The Veteran underwent a VA examination in January 2009. The Veteran reported a sad mood and lack of interest for significant activities daily of a severe intensity; social isolation daily of a severe intensity; fear of what the future may bring daily of a moderate severity; sleep difficulties described as problems initiating sleep and staying asleep twice week of a moderate intensity; decreased concentration and poor ideal organization of a severe intensity. Examination showed the Veteran to have a clean, neat, and appropriate general appearance. His psychomotor activity and speech were unremarkable; attitude was cooperative and attentive with an appropriate affect. His mood was depressed. The Veteran attention was intact and he was fully oriented. His thought process and content were unremarkable with normal judgment and average intelligence, and he had no delusions, hallucinations, obsessive, ritualistic, or inappropriate behavior, or panic attacks. Impulse control was good with no episodes of violence and no suicidal or homicidal ideations. The Veteran was able to maintain minimum hygiene and had no problems with his activities of daily living. Although his remote and recent memory were normal, his immediate memory was severely impaired. 

The examiner diagnosed major depressive disorder and assigned a GAF score of 65, which contemplates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or schooling functioning (e.g., occasionally truancy, or theft within the household), but generally functioning pretty well, with some meaningful interpersonal relationships. The examiner opined that the mental disorder was manifested by signs and symptoms that are transient or mild and decrease work efficiency and ability to perform occupational tasks only during periods of significant stress. As an example the examiner noted that the Veteran reported having anger outbursts when confronted with groups of people causing difficulties to interact appropriately with peers at a gainful job. The Veteran was currently unemployed due to his physical disorders.

At a December 2009 psychiatric consultation, the Veteran endorsed "up and down mood" for most of his life. He has no difficulty with sleep, appetite, or energy levels. He reported fair concentration and motivation. He denied psychosis but stated that at times, he sees shadows and used to feel followed. He also denied suicidal or homicidal ideations. The examiner noted symptoms of depression and psychosis and assigned a GAF score of 55, which reflects moderate symptoms or moderate difficulty in social, occupational, or school functioning.

From February through May 2010, psychiatric progress notes showed that the Veteran was presenting symptoms of recurrence of depression. A GAF score of 58 was assigned, which reflects moderate symptoms or moderate difficulty in social, occupational, or school functioning. A mental status examination showed the Veteran was fully oriented with normal speech, thought process, and content, no suicidal or homicidal ideations, fair insight, good judgment, and intact memory. 

August 2010 treatment records showed depressive symptoms as evidenced by depressed mood, anxiety, paranoid disposition, and obsessive-compulsive disorder symptoms. A mental status examination showed he had adequate hygiene; he was cooperative with a coherent thought process and normal thought content, with no suicidal ideas or plans. He denied auditory or visual hallucinations. His mood was euthymic with mild depression and his affect was blunted. He was fully oriented with an intact memory and good concentration and attention. Abstraction was normal and judgment and insight were fair. The psychiatrist diagnosed dysthymia in partial remission and polysubstance abuse and dependence in sustained remission and assigned a GAF score of 70, which reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or schooling functioning (e.g., occasionally truancy, or theft within the household), but generally functioning pretty well, with some meaningful interpersonal relationships.

In a November 2010 record, the social worker stated that the Veteran underwent a behavioral psychosocial assessment. The Veteran exhibited adequate hygiene, was alert and oriented, had coherent and relevant speech, and denied suicidal plans and intent. He reported that he loves alone and had some family support. He also reported that he helps two elderly friends, visiting them and taking them shopping and to pay bills. 

Psychiatric treatment notes from December 2010 through September 2012 showed a diagnosis of dysthymia as per history in remission, polysubstance abuse in partial remission. A GAF score of 70 was assigned, which contemplates some mild symptoms or some difficulty in social, occupational, or schooling functioning, but generally functioning pretty well, with some meaningful interpersonal relationships. The Veteran reported feeling stable. Examinations showed he was cooperative with adequate hygiene, and a coherent thought process and normal thought content. There were no suicidal ideas or plans. His mood was euthymic with mild depression and his affect was blunted. The Veteran stated that he had visual hallucinations of figures. He was fully oriented with an intact memory and good concentration and attention. Abstraction was normal and judgment and insight were fair. The examiner concluded the Veteran had depression with a tendency to abuse alcohol and controlled substances such as cocaine and marijuana. 

A VA examination was conducted in January 2013. The examiner noted diagnoses of major depressive disorder, cocaine abuse, and alcohol abuse. The current GAF score was 70, which reflects some mild symptoms or some difficulty in social, occupational, or schooling functioning, but generally functioning pretty well, with some meaningful interpersonal relationships. The examiner stated that his mental condition has been formally diagnosed but symptoms are not severe enough either to interfere with occupational and social functioning or to require continuous medication. The Veteran's only noted symptom was anxiety. The examiner opined that the Veteran was found to have signs and symptoms compatible with major depression, alcohol abuse, and cocaine abuse. The Veteran's mental conditions are separate entities with different pathophysiological mechanisms; however, cocaine abuse and alcohol may have been an attempt at self-medicating major depressive symptoms. Presently, symptoms of depression, alcohol abuse, and cocaine abuse are merged in one condition. 

The examiner further noted that the Veteran was coherent, logical, and relevant. Since his last VA examination for the service connected mental condition, the Veteran had not experienced a significant decrease in functionality, had not been hospitalized, and there was no evidence of psychological crisis or changes in pharmacological treatment in relation to the depressive condition. The examiner found the conditions chronic, persisting, and stable. The Veteran was in poor compliance with medications and was using alcohol and cocaine as substitutes. During the last year, the Veteran was seen only three times at the mental health clinic with the last VA psychiatric visit in September 2012, at which time the Veteran was very ambiguous about medications and substance abuse. Regarding the Veteran's social and occupational functioning, the examiner opined that the major depression, alcohol abuse, and cocaine abuse were not limiting his capacity to interact and sustained a non-stressful job, such as a repetitive or stressless job. Veteran's mental conditions were chronic and stable and the Veteran has been hospitalization free without emotional crisis or had any trouble with medications. The examiner noted that as per Veteran, last cocaine and alcohol abuse was at a Christmas party with some friends. This is evidence that there is not a social impairment in Veteran's life."

In this case, the evidence does not show the Veteran is entitled to a rating in excess of 30 percent. The Board has considered the Veteran's lay statements describing symptoms, such as sleep impairment, depression, anxiety, and lack of motivation. The Board has also considered the treatment records and VA examination reports showing his symptoms to be anxiety and depressed mood. 

As noted above, a 50 percent rating will be assigned when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships.

The evidence does not show that the Veteran had a flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory; impaired judgment; and impaired abstract thinking. In fact, the January 2009 VA examiner indicated that the Veteran's affect was normal and that his speech was unremarkable. It was also noted that he did not have panic attacks and that while there was immediate memory impairment, his remote and recent memory were normal. He was fully oriented, his thought process and content were unremarkable, and in terms of judgment, he understood the outcome of his behavior. The Veteran has not contended or reported otherwise. 

Additionally, the treatment records showed the Veteran demonstrated normal speech, full orientation, denial of suicidal thoughts, and fair judgment and insight. Although the treatment records record that he endorsed some visual hallucinations of shadows and figures, his symptoms, when taken as a whole, do not meet the criteria for an increased rating. With regard to occupational impairment, both VA examiners noted that the Veteran's depression symptoms did not interfere with his ability to maintain non-stressful employment. His treatment records show he was unemployed due to his physical disabilities. As for social impairment, the evidence of record did not demonstrate difficulty in maintaining social relationships. 

Moreover, the VA examiners indicated that PTSD's signs and symptoms were transient or mild with decrease work efficiency and ability to perform occupational tasks only during periods of significant stress. Neither found him to have any greater level of impairment. Overall, the Veteran has not demonstrated symptoms consistent with the general level of impairment warranting a 50 percent evaluation, or akin to the symptoms listing as found in the rating criteria. Mauerhan, supra. 

Finally, the Board acknowledges that the Veteran's GAF scores range between 55 and 70. A GAF of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co- workers. A GAF score 61 to 70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or schooling functioning (e.g., occasionally truancy, or theft within the household), but generally functioning pretty well, with some meaningful interpersonal relationships. See 38 C.F.R. §§ 4.125, 4.130. These findings do not mandate a 50 percent evaluation, but reflect that the Veteran is mildly to moderately impaired due to his service-connected psychiatric disorder. Such findings fit squarely within a 30 percent evaluation.

When all of the evidence and findings contained therein are considered in totality, including the degree of functioning as evidence by the GAF scores, the Board finds that the Veteran has been shown to have occupational and social impairment with reduced reliability and productivity. The Board concludes that the preponderance of the evidence is against a finding that an evaluation in excess of 30 percent is appropriate and the benefit of the doubt rule is not applicable. See 38 U.S.C.A. § 5107(b); Gilbert, 1 Vet. App. at 54-56.

Extraschedular consideration

In reaching this decision, the potential application of various provisions of Title 38 Code of Federal Regulations have been considered, whether or not they were raised by the Veteran. Schafrath v. Derwinski, 1 Vet. App. 589 (1991). In particular, the Board has considered the provisions of 38 C.F.R. § 3.321(b)(1). However, in this case, the Board finds that the record does not show that the Veteran's depression is so exceptional or unusual as to warrant the assignment of a higher rating on an extra-schedular basis. See 38 C.F.R. § 3.321(b)(1). 

The threshold factor for extra-schedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. See Thun v. Peake, 22 Vet. App. 111 (2008). In this regard, there must be a comparison between the level of severity and symptomatology of the claimant's service- connected disability with the established criteria found in the rating schedule for that disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule and the assigned schedular evaluation is therefore adequate, and no extra-schedular referral is required. Id.; see also VAOGCPREC 6-96 (Aug. 16, 1996). Otherwise, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, VA must determine whether the claimant's exceptional disability picture exhibits other related factors, such as those provided by the extra-schedular regulation (38 C.F.R. § 3.321(b)(1)) as "governing norms" (which include marked interference with employment and frequent periods of hospitalization). 

The evidence in this case does not show such an exceptional disability picture that the available schedular evaluation for the service-connected disability is inadequate. A comparison between the level of severity and symptomatology of the Veteran's assigned rating with the established criteria found in the rating schedule shows that the rating criteria reasonably describe the Veteran's disability level and symptomatology, which primarily consists of depression and anxiety. Such symptoms are contemplated by the schedular criteria set forth in 38 C.F.R. § 4.130, Diagnostic Code 9434. Indeed, the 30 percent evaluation contemplates the overall effect of all of his symptomatology on his occupational and social functioning. As discussed above, there are higher ratings available under the diagnostic code, but the Veteran's disability is not productive of such manifestations. 

The Board further observes that, even if the available schedular evaluation for the disability is inadequate, the Veteran does not exhibit other related factors such as those provided by the regulation as "governing norms." As discussed above, the Veteran's VA treatment records show no hospitalizations and that the Veteran is unemployed due to his physical disabilities, not his depression. The evidence fails to show that depression has caused frequent hospitalizations or impairment with employment over and above that which is contemplated in the assigned schedular rating. See Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993) [noting that the disability rating itself is recognition that industrial capabilities are impaired]. 

Based on the foregoing, the Board finds that the requirements for an extra-schedular evaluation for the Veteran's service-connected PTSD under the provisions of 38 C.F.R. § 3.321(b)(1) have not been met. 


ORDER

As new and material evidence has been received sufficient to reopen a claim of service connection for a back disorder, the Veteran's petition to reopen is granted.

Service connection for bilateral hearing loss is denied.

Service connection for a right knee disorder is denied.

A rating in excess of 30 percent for depression is denied. 


REMAND

Remand is necessary to afford the Veteran a VA examination regarding the etiology of his back disorder. The Veteran contends that he injured his back during service and has experienced pain in his back since that time. Treatment records show that the Veteran has complained that his back pain has existed since service. A record dated July 2003 from a private physician notes that the "L. syndrome" as noted during service means lumbar syndrome. To date, no VA examination has been afforded to the Veteran. Therefore, the Board finds that a VA examination and medical opinion are needed. McLendon v. Nicholson, 20 Vet. App. 79, 81 (2006). 

The Veteran has also asserted that he is unable to work due to his service-connected disorders. As the Board also finds the issue of entitlement to a TDIU inextricably intertwined with the Veteran's pending claim of service connection for a back disorder, this issue must also be remanded to the AOJ. See Harris v. Derwinski, 1 Vet. App. 180, 183 (1991) (holding that two issues are "inextricably intertwined" when they are so closely tied together that a final Board decision cannot be rendered unless both issues have been considered). The Board thus finds that the issue of TDIU has been raised, and that it must be remanded for adjudication.

Accordingly, the case is REMANDED for the following action:

1. Contact the appropriate VA Medical Center and obtain and associate with the paper or virtual claims file all outstanding records of treatment. If any requested records are not available, or the search for any such records otherwise yields negative results, that fact must clearly be documented in the claims file. Efforts to obtain these records must continue until it is determined that they do not exist or that further attempts to obtain them would be futile. The non-existence or unavailability of such records must be verified and this should be documented for the record. Required notice must be provided to the Veteran and his or her representative. 

2. After any additional records are associated with the claims file, the RO must afford the Veteran a VA examination to determine the nature and etiology of any low back disorder that may be present. The entire claims file should be made available to and be reviewed by the examiner, and it should be confirmed that such records were available for review. Any indicated tests and studies must be accomplished and all clinical findings must be reported in detail and correlated to a specific diagnosis. An explanation for all opinions expressed must be provided. 

The examiner must provide an opinion, in light of the examination findings and the service and post-service evidence of record whether it is at least as likely as not (50 percent or greater probability) that the back disorder was caused or aggravated by the Veteran's military service. The examiner must specifically address the Veteran's assertions of an in-service injury and pain since that time. The examiner must also specifically address the notation of "L syndrome" contained in the Veteran's STRs. The examiner must also address the November 2001 private examination in which the Veteran stated that he injured his back in 2001 (almost 20 years after service).

3. Notify the Veteran that it is his responsibility to report for any scheduled examination and to cooperate in the development of the claim, and that the consequences for failure to report for a VA examination without good cause may include denial of the claim. 38 C.F.R. §§ 3.158, 3.655 (2014). In the event that the Veteran does not report for any scheduled examination, documentation must be obtained which shows that notice scheduling the examination was sent to the last known address. It must also be indicated whether any notice that was sent was returned as undeliverable.

4. Review the examination report to ensure that it is in complete compliance with the directives of this remand. If the report is deficient in any manner, the AOJ must implement corrective procedures. Stegall v. West, 11 Vet. App. 268, 271 (1998). 

5. After completing the above action, and any other development as may be indicated by any response received as a consequence of the actions taken in the paragraphs above, the claim must be readjudicated. If the claim remains denied, a supplemental statement of the case must be provided to the Veteran and his representative. After the Veteran and his representative have had an adequate opportunity to respond, the appeal must be returned to the Board for appellate review.

The Veteran has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
K. MILLIKAN
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs